
**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 24, 2022

**VIA ECF**
The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Eric Spencer*, 21 Cr. 193 (GHW)

Dear Judge Woods:

    The defendant in this case, Eric Spencer, is scheduled to be sentenced on June 30, 2022 at 9:00 a.m., after having been convicted by a jury of conspiracy to commit Hobbs Act Robbery and substantive Hobbs Act robbery, in violation of Title 18, United States Code, Section 1951. For the reasons explained below, the Government submits that a sentence below the United States Sentencing Guidelines ("U.S.S.G.") range—comparable to the range that would result without the disputed sentencing enhancements—is warranted in this case.

**I.**    **Background**

    **A.**    **Offense Conduct and Procedural History**

    On February 2, 2021, the defendant and four co-conspirators robbed the Chanel store in Soho. *See* Presentence Investigation Report ("PSR") ¶¶ 9-21. The robbery began when a security guard opened the door for one of the robbers, who braced the door so that Spencer and another co-conspirator could enter the store. Spencer then proceeded to intimidate and threaten the store's security guards and employees. First, he moved toward Suzy Murphy and put his hand inside the waistband of his pants to indicate he had a firearm. Second, when a second armed guard, Vivian Harvey, opened her jacket and put her hand on her exposed weapon, Spencer moved towards her and the store manager, yelled repeatedly, "You gonna shoot me?" and again put his hand inside his pants to indicate that he, too, was armed. *Id.* ¶¶ 12-14. The three robbers then began yanking merchandise off shelves and displays, along with a fourth robber who was already in the store, posing as a customer, when the others forced their way inside. *Id.* ¶ 16.

    At trial, both armed and unarmed security guards and the store manager all testified about Spencer's threatening conduct. Their testimony was corroborated by store surveillance videos and demonstrated that they feared for the safety of their colleagues and themselves. *Id.* ¶ 15. A cellphone video taken by a store employee also showed that Spencer and a coconspirator yelled "move move move" and "back the fuck up" in the course of the robbery. *Id.* ¶ 18. After about two minutes, Spencer and his co-conspirators fled the store with their arms loaded with over $200,000

in Chanel merchandise. *Id.* ¶ 18. Surveillance video from other stores on the street before and after the robbery indicated the involvement of a fifth co-conspirator driving the getaway vehicle. *Id.* ¶ 19. Within hours of the robbery, Spencer went on his Facebook account and publicly proclaimed, "so much double C right now I could open a small boutique FRFR [for real, for real]." Tr. 496, 750.

On February 20, 2021, the defendant was arrested in Miami, Florida. On March 22, 2021, an Indictment was filed in the Southern District of New York (the "Indictment"), charging the defendant with one count of conspiracy to commit Hobbs Act Robbery (Count One) and one count of substantive Hobbs Act robbery (Count Two), in violation of Title 18, United States Code, Sections 1951 and 2. The defendant's trial began on March 22, 2022, and concluded on March 28, 2022, when the jury returned a verdict of guilty on all counts.

At trial, the defendant chose to take the stand. He admitted that the Facebook account belonged to him, as did the phone from which law enforcement had recovered photographs of Chanel bags. Tr. 670, 742, 750. He also admitted he had attempted to sell Chanel bags online, informing one potential buyer that though the bags retailed for $5,000 a piece, he was selling them for $2,000. Tr. 745. But he lied and claimed that he had obtained the bags through legitimate means and that he had taken no part in the robbery. Tr. 672.

**B.   The PSR**

On June 17, 2022, the U.S. Probation Office issued its PSR. The report calculated an applicable Guidelines range of 151 to 188 months' imprisonment (the "PSR Guidelines Range") based on an offense level of 29 and a criminal history category of VI. PSR ¶ 96. Probation recommends a sentence of 151 months' imprisonment.

The PSR leaves to the Court the applicability of a two-point obstruction enhancement pursuant to U.S.S.G. § 3C1.1. *Id.* ¶ 33. That enhancement is indisputably appropriate. At trial, the defendant lied under oath by repeatedly denying his involvement in the robbery during direct and cross examination, in the face of overwhelming evidence of his guilt. As the jury's verdict makes clear, that testimony was false. Accordingly, and as the Government noted in its response to a draft of the PSR, application of the enhancement under U.S.S.G. § 3C1.1 is warranted, resulting in an offense level of 31, a criminal history category of VI, and a Guidelines range (the "Guidelines Range") of 188 to 235 months' imprisonment.

**C.   The Defense's Submission**

The defense disputes the applicability of three enhancements applied by Probation in calculating the offense level. First, the defense contests the application of a three-level weapons enhancement under U.S.S.G. § 2B3.1(b)(2)(E) on the theory that the defense did not use his hand in such a way that indicated he possessed a weapon. Def's Br. 2-4. Second, the defense contests the application of a two-level enhancement for the loss amount—more than $200,000 and less than $500,000—under U.S.S.G. § 2B3.1(b)(7)(C) based on his claim that the loss amount should be the "replacement cost of the stolen items" and not the retail value of the stolen merchandise. Def's Br. 4-6. Third, the defense contests the application of a four-level leadership enhancement under

U.S.S.G. § 3B1.1(a) because of the alleged insufficiency of the evidence in establishing that the defendant exercised decision-making authority or control or had any larger claim to the stolen merchandise than his co-conspirators. Def's Br. 6-7.

Lastly, the defense asserts that Probation's recommendation of 151 months is excessive relative to sentences received by defendants who committed more serious robberies, and given the defendant's "largely non-violent" criminal history and the hardship such a sentence would pose on his family.

The defense does not address the potential applicability of the two-level obstruction enhancement under U.S.S.G. § 3C1.1. Without the enhancement, the defense's calculation would result in an offense level of 20 and a Guidelines range of 70 to 87 months. With the enhancement, the defense's calculation would result in an offense level of 22 and a Guidelines range of 84 to 105 months.

## II.  Discussion

The Government believes that evidence adduced at trial established, by a preponderance of the evidence, the applicability of all three enhancements disputed by the defense and applied by Probation. In addition, a two-level obstruction enhancement applies because the defendant perjured himself on the stand.

But the Government recognizes that two of the disputed enhancements—regarding the defendant's use of a dangerous weapon and leadership role in the robbery—present close questions. Because, for the reasons discussed below, the Government agrees with the defense that the facts of this case call for a sentence below the PSR Guidelines Range of 151 to 188 months' imprisonment, and indeed warrant a sentence within the range that would result if none of the disputed or potentially disputed enhancements applied (70 to 87 months), the Court need not resolve these questions.

### A.  Applicable Law

Following *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone in the sentencing of defendants. Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult" them and "take them into account" when determining an appropriate sentence. *Booker*, 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range

itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant;

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B. The Applicable Enhancements

The Government agrees with, and the evidence adduced at trial supports, Probation's application of (i) a three-level weapons enhancement under U.S.S.G. § 2B3.1(b)(2)(E), (ii) a two-level enhancement for loss amount under U.S.S.G. § 2B3.1(b)(7)(C), and (iii) a four-level leadership enhancement under U.S.S.G. § 3B1.1(a). In addition, the defendant's perjury at trial warrants (iv) a two-level obstruction enhancement under U.S.S.G. § 3C1.1. But to the extent the weapons enhancement and leadership enhancement present close questions, the Court need not resolve them here, as the Government recognizes the appropriateness of a sentence within the range that results without any of the disputed enhancements.

    1. *The Weapons Enhancement Under U.S.S.G. § 2B3.1(b)(2)(E)*

A three-level enhancement applies "if a dangerous weapon was brandished or possessed." U.S.S.G. § 2B3.1(b)(2)(E). Application Note 2 further explains that an "object" qualifies as a dangerous weapon under this provision if:

> the defendant used the object in a manner that created the impression that the object was an instrument capable of inflicting death or serious bodily injury (e.g., a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun).

As the defense observes, just as in *United States v. Taylor*, 961 F.3d 68 (2d Cir. 2020), here the question is whether the defendant used his hand in a manner that qualifies for application of the enhancement. Contrary to the defense's conclusion, however, *Taylor* does not undermine but supports the application of the enhancement in this case.

June 24, 2022  Page 5
Hon. Gregory H. Woods

In *Taylor*, in deeming the weapons enhancement inapplicable for a robber who indisputably indicated he had a weapon, the Second Circuit emphasized that the defendant never concealed his hand such that the victims could possibly perceive his hand as the weapon:

> Oneal kept one hand near his waistband, *not inside it. An unconcealed hand would not appear to be itself a weapon*. During the May 19 robbery, Oneal pretended to possess firearms by holding his belt. *While someone could conceal a hand within his or her pants to make the hand appear to be a weapon*, using a hand to hold a belt is not using one's hand to make the hand appear to be a weapon.

*Id.* at 75 (emphasis added). Here, in contrast, it is undisputed that the defendant deliberately concealed his hand twice during confrontations with two different guards, one visibly armed. Four victims testified that, based on the timing and deliberateness of the action, he plainly did so for the express purpose of "indicating that he was also armed." Tr. 169 (Laroya); *see also* Tr. 80 (Washington); 196 (Harvey) 235 (Murphy).

The defense argues that this concealment is insufficient to meet the standard because it amounted to a mere "gesture" implying possession of a weapon, and "none of the witnesses actually saw a gun or an object . . . that mimicked the appearance of a gun." Def's Br. 4. Given that the *Taylor* Court made clear that a concealed hand could qualify for application of the enhancement, the defense appears to be arguing that a concealed hand must necessarily mimic the appearance of a gun by creating a bulge or other visual cue. But nothing in *Taylor* supports that view. Rather, the Second Circuit observed that a hand could be concealed in a way that suggests the hand is itself a weapon and approvingly cited a number of cases in which other courts confirmed the diverse means by which the defendant could make that suggestion.

Most notably, the Second Circuit cited *United States v. Souther*, 221 F.3d 626 (4th Cir. 2000), for its holding that "a concealed hand may serve as an object that appears to be a dangerous weapon" where the defendant concealed the hand in his coat pocket. *Taylor*, 961 F.3d at 76 (quoting *Souther*, at 629–30). Significantly, in *Souther*, the Fourth Circuit was confronted with facts very similar to those of this case and directly addressed what it described as the legal "twist": that is, "the hand was not given the visual appearance of a gun (e.g., Souther did not extend his finger inside his pocket in order to make his hand look like a gun). Neither did Souther wave his concealed hand around or press it into someone's side." In addition, the Fourth Circuit was asked to interpret a slightly different version of Application Note 2: "When an object that appeared to be a dangerous weapon was brandished, displayed, or possessed, treat the object as a dangerous weapon for the purposes of subsection (b)(2)(E)." Compared to the current language at issue here, the unamended language would seem to plausibly require the visual appearance of a firearm, since it turns on what the object "appeared to be," rather than the "manner" in which the object was "used."

June 24, 2022                                                                                                                               Page 6
Hon. Gregory H. Woods

      Yet the Court concluded that the defendant's concealed hand was "an object that appeared to be a dangerous weapon," in accordance with what was then the language of Application Note 2. Although nothing suggested the defendant used his concealed hand to create the outline or any physical manifestation of a gun, the Court held the hand appeared to be a gun "because it was concealed in his coat pocket and because he told the teller via the note that he possessed a gun." *Souther*, 221 F.3d at 629. In short, the court "decline[d] to restrict the meaning of the word 'appear' to visual or sensorial appearances." *Id.*

      Application Note 2 was replaced with the current language in 2000 per Amendment 601, which explains that one of the purposes of the amendment was to "increase punishment in some circumstances for persons who 'make the presence of the weapon known to another person, in order to intimidate that person,' regardless of whether the weapon is visible." Appendix C, Amendment 601.[1] This explanation makes plain the Sentencing Commission's agreement with the holding of *Souther* and similar decisions adopting an expansive view on how a robber might seek to use an object to intimate possession of a weapon.

      Here, the defendant concealed his hand in his pants twice to imply that he was armed—and once, he did so in direct response to an armed security guard reaching for her weapon, and while stepping toward her and daring her to try to shoot him. Plainly, and certainly by a preponderance of the evidence, he "used [his hand] in a manner that created the impression that [his hand] was an instrument capable of inflicting death or serious bodily injury." The three-level enhancement applies.

      The Government recognizes, however, that the question presented here is not squarely addressed in *Taylor* and has not been resolved by the Second Circuit. Given the Government does not seek a sentence within the range that would result from application of this enhancement, the Court need not determine whether the enhancement applies in this case.

      2.   <u>*The Loss Amount Enhancement Under U.S.S.G. § 2B3.1(b)(7)(C)*</u>

      Calculation of the loss amount in this case is straightforward. The defendant and his co-conspirators robbed a retail store of clearly priced, meticulously indexed merchandise. Tr. 605-33. On these facts, there is no question that the loss amount—"[t]he fair market value of the property unlawfully taken" per Application Note 3(C)(i)—is the total retail value of the stolen merchandise. Put differently, it is the sum of the prices that customers would have paid Chanel for its bags had the perpetrators not ripped those bags off the displays and stolen them for their own gain.

      To support its contrary position, the defense cites inapposite authorities. In *United States* v. *Machado,* 333 F.3d 1225 (11th Cir 2003), the Eleventh Circuit indeed determined that "the district court erred in measuring loss on the basis of the retail value of the property without considering the factual circumstances of [the defendant's] case." *Id.* at 1228. The factual circumstances of that case were readily distinguishable: the perpetrator stole, among things, 132,000 pieces of underwear from a wholesale dealer who not only obtained the goods at wholesale

---

[1] The full text of Amendment 601 is available at https://guidelines.ussc.gov/ac/601.

valuation, but intended to resell the goods wholesale. *Id.* at 1226. *Machado* in no way undermines retail valuation as the logical and equitable course for loss calculation here. To the contrary, *Machado* supports the use of the price *at which the goods were being offered by the seller*, as the proper basis for the loss calculation.

The defense does not dispute that the defendant and his co-conspirators made off with over $200,000 in Chanel merchandise. But the defense asserts that this retail valuation "greatly overstates Chanel's loss" because, as a luxury handbag brand, Chanel marks up its bags well above production cost, because not all the bags would have been sold, and because the bags might have sold with "significant mark-downs." Def's Br. 5.

The defendant's own testimony on the stand made clear that he targeted Chanel precisely because he perceived that people desire and are willing to pay thousands of dollars for Chanel bags. *See, e.g.*, Tr. 672 ("[E]verybody knows the price of Chanel bags. So if you're from New York City, or wherever, you know Chanel is like a big name brand, so you know it's expensive.") But in any event, the defense cites no apposite authority to support the assertion that the loss calculation properly excludes all profits that retailers stood to make on their stolen goods, that loss amounts must be supported by elaborate evidence that demand equals supply, or that speculation about whether some good would have been marked down should be considered. As the Guidelines themselves make clear, the loss amount is the "fair market value of the property."

The testimony at trial indisputably established that the total retail value of the stolen merchandise was $204,150. Tr. 633. The two-level enhancement applies.

    3. <u>The Leadership Enhancement under U.S.S.G. § 3B1.1(a)</u>

The evidence adduced at trial supports the application of a four-level enhancement applies under U.S.S.G. § 3B1.1(a) because it showed that the defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."

The defense does not dispute that the robbery involved five or more participants—the defendant, three other robbers, and the getaway driver—but contends that insufficient evidence has been put forward to support the defendant's leadership or organizing role in the robbery because the statements he shouted during the robbery "are fairly obvious things individuals [sic] robbers would shout to one another" and because allegedly no evidence was presented that the defendant directed his co-conspirators, enjoyed a larger share of the stolen merchandise, or recruited any of the others. Def's Br. 6-7.

Contrary to the defense's characterization, "the nature of [the defendant's] participation in the commission of the offense," and "the degree of control and authority [he] exercised over others" tend to support his leadership role. The trial testimony established that only one robber—the defendant intimated to victims that he was armed, Tr. 127, and Mr. Washington, testified that the defendant "was [] shouting the orders." Tr. 102. But the Government recognizes that this issue presents a close question of law and fact, and that resolution is not necessary to determining the appropriate sentence in this case. The Government does not seek a ruling from the Court on this question.

        *4.   The Obstruction Enhancement Under U.S.S.G. § 3C1.1*

It is well established that "a defendant's right to testify does not include a right to commit perjury." *United States v. Dunnigan*, 507 U.S. 87, 96 (1993). But because a sentencing enhancement for perjured trial testimony "implicates" a defendant's constitutional right to testify in his own defense, findings must be made "'to support all the elements of a perjury violation in the specific case.'" *United States v. Rosario*, 988 F.3d 630, 633 (2d Cir. 2021) (quoting *Dunnigan*, 507 U.S. at 97). That is, the court must find "that the defendant (1) willfully and (2) materially (3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." *Id.* at 633.

The defendant's testimony readily meets all the elements of a perjury violation: he took the stand and willfully and materially lied numerous times on direct and cross-examination. In addition to flatly denying his involvement in the robbery, the defendant fabricated an elaborate story about how he obtained the Chanel bags that, by his own admission, he sold, claiming he regularly used a social media application to engage in a legitimate business, wherein he bought goods at low prices and sold them at higher prices. Tr. 671. He also insisted that he "didn't go through" Soho on the day of the robbery and that he went to Florida after the robbery for vacation. Tr. 668.

His lies were sufficiently specific that the Government was permitted to impeach him using text messages that would have been excluded if not for his perjury—text messages in which a friend, "Shona Bag Lady," advised him that "West Palm has strip stores like SoHo" that he could also rob. Tr. 737, 774. In allowing the admission of the texts, the Court observed that the text messages could be viewed as contradicting a number of statements the defendant had made under oath: that he did not commit the Chanel robbery, and also that he was not in Soho on the day of the robbery and that he went to Florida merely to go "clubbing" rather than to rob additional stores. Tr. 738-40. The jury's verdict itself also completely repudiates the defendant's false testimony. He claimed not to have participated in the robbery; but the jury found beyond a reasonable doubt that he did.

The defendant's lies cannot be understood as the product of "confusion, mistake, or faulty memory." *United States v. Thompson*, 808 F.3d 190, 194 (2d Cir. 2015). He lied to obstruct justice. The two-level obstruction enhancement is warranted.

**C.  A Below Guidelines Sentence Is Sufficient and Not Greater Than Necessary.**

Although the disputed enhancements, and an obstruction enhancement, properly apply to the Guidelines calculation, the Government agrees with the defense that, under the Section 3553(a) factors, a sentence below the PSR Guidelines Range and within the range resulting from the offense level calculation urged by the defendant (70 to 87 months) would be sufficient and not greater than necessary to achieve the purposes of sentencing.

The offense conduct here is serious and indisputably violent, and the defendant's criminal history is extensive. Troublingly, the defendant committed the instant offense after receiving a

significant state sentence of two years' imprisonment for two grand larcenies that he committed in the space of three months in 2016, which suggests that he has not been deterred from committing crimes. A significant sentence of incarceration is appropriate here, to deter the defendant from continuing his life of crime and to deter others.

But other aspects of the offense conduct suggest that the PSR Guidelines Range is higher than warranted in this case. In particular, although the defendant demonstrated blatant disregard for the victims, it is undisputed that his conduct did not involve the brandishing of a weapon or result in physical injury. As the defense notes, a sentence of 151 to 188 months' imprisonment would nonetheless be lengthier than sentences given to defendants who threatened victims with visible weapons in multiple robberies. *See* Def's Br. at 7 (citing *United States v. Jones*, 2017 WL 3049543, at *1–3 (S.D.N.Y. July 17, 2017) (defendant who brandished a gun during four robberies and threatened to use it against victims sentenced to 125 months' imprisonment)). Indeed, a sentence within this range would result in a term of imprisonment four or five times as long as the sentences accorded to robbery defendants whose victims were actually slashed with a knife or shot. *See, e.g.*, *United States v. Lahens*, 20 Cr. 696 (VSB) (defendant sentenced to 30 months' imprisonment after committing 16 knifepoint robberies where one victim was slashed); *United States v. Daniels*, 13 Cr. 416-02 (RMB) (defendant sentenced to 36 months' imprisonment after committing an armed robbery of a car dealership, during which one of his co-conspirators shot a victim in the leg Hobbs Act). The sentences rendered in these other, more serious robberies support the imposition of a sentence below ten years in this case.

In addition, the defense correctly points out that the PSR Guidelines Range "is driven in substantial part by Mr. Spencer's criminal history." Def's Br. at 7. Specifically, the defendant's criminal history category—the highest available, VI—is in part a function of an idiosyncrasy in how the Guidelines are calculated. Although the defendant is a recidivist, most of his past offenses are misdemeanors that resulted in numerous sentences of 15 to 90 days. PSR ¶¶ 7-10. Each of these sentences have added one or two points to the defendant's criminal history and they are not subject to a cap, resulting in an inflated criminal history category that is typically reserved for the most seasoned felons.

Without question, the defendant has demonstrated a commitment to criminal conduct despite repeated prison and probationary sentences, and the trauma he has caused his victims and the danger he poses to society cannot be ignored. A significant term of imprisonment is appropriate to reflect the seriousness of the offense, to provide just punishment, to deter future criminal conduct, and to protect the public. But the defendant's offense conduct also falls short of the worst conduct contemplated by the applicable Guidelines, yet his offense level and criminal history category place him near the very top of the allowable sentencing range for defendants who have committed Hobbs Act robbery and conspiracy.

Under these circumstances, a sentence significantly below the PSR Guidelines Range would be sufficient to achieve the purposes of sentencing and would more fairly reflect the facts specific to this offense and this defendant.

June 24, 2022 Page 10
Hon. Gregory H. Woods

### III. Conclusion

      For the reasons set forth above, the Government respectfully requests that the Court impose a sentence below the PSR Guidelines Range of 151 to 188 months' imprisonment.

                Very truly yours,

                DAMIAN WILLIAMS
                United States Attorney

by: _____
                Jane Y. Chong
                Matthew R. Shahabian
                Assistant United States Attorneys
                (212) 637-2263/-1046